# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>)<br>v. )<br>) Docket no. 2:18-CR-00061-GZS<br>JONATHAN LARA, )<br>)<br>)<br>Defendant. )<br>) | |

## ORDER ON MOTION TO SUPPRESS

Before the Court is Defendant's Motion to Suppress (ECF No. 28). The Court held an evidentiary hearing on this Motion on October 3, 2018,[1] and, thereafter, received supplemental briefing from Defendant (ECF No. 41). After considering the exhibits and testimony presented at the hearing, as well as the arguments advanced by counsel, the Court now GRANTS IN PART AND DENIES IN PART the Motion.

### I.  FACTUAL FINDINGS

On the morning of August 7, 2017, Special Agent Nicholas Gagnon ("Gagnon") of the Maine Drug Enforcement Agency responded to the scene of an overdose at a convenience store in Auburn. Upon Gagnon's arrival, he learned that Defendant Jonathan Lara ("Lara") was the individual involved, and that he had already been transported to the hospital. In the course of his investigation, Gagnon discovered that, shortly before Lara's collapse, a witness saw Lara spend several minutes in the passenger seat of a black PT Cruiser. After further investigation into the

---

[1] Two witnesses testified at the hearing: Special Agent Nicholas Gagnon of the Maine Drug Enforcement Agency and Task Force Officer Scott Hill of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Cruiser's owner, Gagnon searched the Cruiser. Inside, he found a large amount of illegal drugs and several rounds of live handgun ammunition. Gagnon then arrested the Cruiser's owner who, in an effort to cooperate, stated that more drugs and guns could be found in "room 230 something" at the Ramada Inn.

Intending to follow up on that lead, Gagnon recruited two other officers and drove to the Ramada Inn located in Lewiston. There, Gagnon checked the guest list and found that room 236 was registered to Lara, who Gagnon believed was still in the hospital. The officers, all wearing plain clothes, then walked to room 236. Gagnon knocked and a female voice asked who was there. Gagnon replied that there was a water issue in the room and requested to come in and "check the tank." The woman opened the door and, at that point, could see that the men were police officers as they had their badges displayed. From his vantage point in the hallway, Gagnon immediately observed a man slumped over backwards in a chair inside the room. He also saw that the man was holding a plastic baggie, and that there was a "white chunk" on the desk in front of him, which appeared to be cocaine. Based on these observations, as well his knowledge that the room's renter had overdosed earlier that morning, Gagnon entered the room to check on the man's well-being. Gagnon quickly confirmed that the man was breathing. Then, aware that there might be a gun in the room, and believing that some addicts react violently to being woken up, Gagnon directed another officer to handcuff the man. Satisfied with their safety, the officers then woke him up and identified him as Lara. Gagnon believed Lara was under the influence of drugs at that time.

Gagnon next departed the hotel to apply for a search warrant for room 236. His affidavit recounted the investigation and listed the evidence of drug related activity he had observed from the hallway outside the room. A state court judge granted the warrant. With it in hand, Gagnon

returned to room 236 where other officers, including Scott Hill ("Hill"),[2] had been waiting with Lara. Pursuant to the warrant, Gagnon searched the room and found, among other things, $7,606 in cash, cocaine base rocks, and a .40 caliber handgun. After completing the search, Gagnon advised Lara that he was under arrest for drug trafficking but did not *Mirandize* him. Lara then became agitated and stated that he was a drug user not a drug dealer. In response, Gagnon said that "drug users don't have the ability to keep thousands of dollars around" and told Lara that he could talk to his lawyer. Lara replied by admitting that the firearm was his and asserting that he stole the money from a drug dealer in Lynn. Officers then transported Lara to an interview room at the Androscoggin County Jail where he met with Hill. Hill explained that he would be recording any conversation between them, turned on his recorder, and *Mirandized* Lara. Lara indicated verbally that he understood his rights and then signed a written waiver.

During the ensuing conversation, Lara admitted that he purchased the firearm off the street but denied being a drug dealer. He claimed that he possessed the drugs in the hotel room because he is an addict and indicated that he spends over one hundred dollars per day on drugs. Eventually, Lara reached across the table and turned off the recorder, concluding the interview. According to Hill's testimony, Lara appeared tired but not intoxicated during their conversation, and could speak without slurring his words. In the recording Lara sounds alert, responsive, and lucid. The Court therefore credits Hill's testimony regarding his encounter with Defendant.

## II. DISCUSSION

Defendant first contends that Gagnon's use of a ruse to gain visual access to the hotel room constituted a violation of his Fourth Amendment rights such that all evidence and statements

---

[2] Hill was not present when officers initially gained access to the room. He arrived on the scene shortly after Gagnon left to secure the warrant. Thereafter, Hill waited with Lara for over an hour during Gagnon's absence and remained present during the search and Lara's arrest. Hill departed when other officers transported Lara from the scene.

3

obtained thereafter are the "fruit of the poisonous tree." See Utah v. Strieff, 136 S.Ct. 2056, 2061 (2016) (internal quotation marks omitted). This argument fails under existing precedent.

It is true, as Defendant points out, that he had a reasonable expectation of privacy in his hotel room. See Stoner v. California, 376 U.S. 483, 490 (1964) ("a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures"). However, Gagnon's tactics did not violate that expectation here. In Lewis v. United States, the Supreme Court held that it is constitutionally permissible for police officers to misrepresent their identities to gain consent to enter a suspect's home. See 385 U.S. 206, 208-211 (1966). Numerous courts have since applied that principle to admit evidence obtained through various methods of government subterfuge. See, e.g., United States v. Scherer, 673 F.2d 176, 181-182 (7th Cir. 1982) (agent masquerading as informer's cousin to secure invitation onto the defendant's property); United States v. Wright, 641 F.2d 602, 603-605 (8th Cir. 1981) (officers posing as fellow hotel residents with car trouble in order to see inside the defendant's hotel room); United States v. Glassel, 488 F.2d 143, 144-145 (9th Cir. 1973) (officer pretending to be potential drug buyer to garner invitation into the defendant's home). As in those cases, Gagnon used only "minimal deception" in convincing the occupant of the room to allow him a view inside, and his actions, therefore, did not amount to an illegal warrantless search.[3] Wright, 641 F.2d at 605. Consequently, the evidence and statements obtained following the interaction at the door cannot be suppressed as the "fruit of the poisonous tree" on this ground. See Strieff, 136 S.Ct. at 2061.

Defendant next argues that his statements in the hotel room should be suppressed because Gagnon elicited them during a custodial interrogation, which was unaccompanied by procedural

---

[3] The Court notes that a few federal cases have found that ruses involving life-threatening emergencies, such as a gas leak or a kidnapped child, are so coercive that they vitiate any consent obtained therefrom. See, e.g., United States v. Montes-Reyes, 547 F. Supp. 281, 291 (S.D.N.Y. 2008); United States v. Giraldo, 743 F. Supp. 152, 154 (E.D.N.Y. 1990). However, the Court concludes that Gagnon's ruse did not rise even close to that level.

4

safeguards.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The Court agrees that Defendant's second statement in the hotel room must be suppressed as the product of an un-*Mirandized* custodial interrogation, but declines to suppress his first statement.

Absent a proper *Miranda* warning, any statements that the government obtains through "custodial interrogation" must be suppressed.  See Illinois v. Perkins, 496 U.S. 292, 296 (1990).  A "custodial" situation arises where a defendant has been formally arrested or has experienced "restraint on freedom of movement of the degree associated with a formal arrest."  United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007) (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)).  "Interrogation," on the other hand, involves either "express questioning" or its "functional equivalent" meaning "words or actions … that the police should know are reasonably likely to elicit an incriminating response."  Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980).  This inquiry turns on "an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances."  United States v. Taylor, 985 F.2d 3, 7 (1st Cir. 1993).

It is undisputed that, at the time Defendant made the incriminating statements in the hotel room, he was under arrest and in custody for purposes of *Miranda*.  See Mittel-Carey, 493 F.3d at 39.  The critical question in determining whether those statements should be suppressed, therefore, is whether they were the product of "interrogation."  See United States v. Ventura, 85 F.3d 708, 711-712 (1st Cir. 1996).  There was no express questioning in this case, so the answer turns on whether Gagnon subjected Defendant to the "functional equivalent" of questioning.  Innis, 446 U.S. at 301. Defendant's first statement, that he was a drug user not a drug dealer, was spontaneous and neither solicited nor coerced by Gagnon in any way.  As a result, it is not subject to suppression.  See United States v. Rogers, 41 F.3d 25, 31 (1st Cir. 1994) (upholding decision not

5

to suppress statement where there was no evidence that it was anything other than spontaneous). Defendant's second statement, however, regarding the gun and theft, was an explanation offered to counter Gagnon's assertion that "drug users don't have the ability to keep thousands of dollars around." This assertion by Gagnon was not a "mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning." See United States v. Conley, 156 F.3d 78, 83 (1st Cir. 1998) (concluding that "mere description of the evidence and of potential charges" is not interrogatory). Rather, objectively viewed, it was uninvited, confrontational, and essentially "posit[ed] the guilt of the subject." See Innis, 446 U.S. at 299 (internal quotation marks omitted). Having considered the entire course of conduct of the officers, the Court concludes that Gagnon's assertion was "reasonably likely to elicit an incriminating response" and that he should have known as much. See id. at 301. See also United States v. Jackson, 544 F.3d 351, 357 (1st Cir. 2008) (suppressing statement as "the product of the unwarned interrogation" although statement was not made in response to direct questions). Thus, Defendant's response to it must be suppressed.[4]

Defendant lastly argues that his interview statements should be suppressed because he was too intoxicated to have "knowingly and intelligently" waived his *Miranda* rights. See Miranda 384 U.S. at 444. In deciding this issue, "[t]he district court must begin with the presumption that

---

[4] To the extent Defendant argues that his subsequent *Mirandized* statements should be suppressed as "tainted" by his un-*Mirandized* interrogation in the hotel room, the Court disagrees. The First Circuit has explained, citing Oregon v. Elstad, that "in the absence of coercion or improper tactics by law enforcement in obtaining an initial statement, a subsequent statement is admissible if the defendant was advised of his *Miranda* rights and knowingly and voluntarily waived those rights." United States v. Faust, 853 F.3d 39, 47-48 (1st Cir. 2017) (citing 470 U.S. 298, 318 (1985)). There is no evidence in this case that Gagnon obtained either statement at the hotel by violence or any other kind of "deliberately" coercive or improper tactic. See Elstad, 470 U.S. at 314. Thus, the admissibility of Defendant's later statements turns on whether he knowingly and intelligently waived his rights before making them. See Faust, 853 F.3d at 47-48. As discussed infra, Defendant did so waive his rights. The Court also notes that Defendant does not argue that the officers' actions here constituted an illegal two-step interrogation. Even if he did, such an argument would fail under either test articulated in Missouri v. Seibert. See id. at 48-49 (discussing application of Seibert). See generally Missouri v. Seibert, 542 U.S. 600 (2004).

6

the defendant did not waive his rights." United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003). "The government bears the burden of proving a valid waiver by a preponderance of the evidence." Id. Here, the government has carried its burden.

"A defendant may waive his *Miranda* rights if the waiver is made voluntarily, knowingly, and intelligently." United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000) (citing Miranda, 384 U.S. at 444). A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "A waiver is knowing and intelligent when made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. (internal quotation marks omitted). "Both inquiries are judged based on the totality of the circumstances surrounding the interrogation." Id. at 39-40 (internal quotation marks omitted).

As an initial matter, the government has demonstrated that there is no evidence of intimidation, coercion, or deception. Therefore, it has carried its burden as to voluntariness. See United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998) ("only confessions procured by *coercive official tactics* should be excluded as involuntary") (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)). Second, the totality of the circumstances establishes by a preponderance of the evidence that Defendant's waiver was knowing and intelligent. See Bezanson-Perkins, 390 F.3d at 39. During the interview, as noted above, Defendant was alert, responsive, and lucid. He answered questions coherently, asked some of his own, and ultimately terminated the conversation of his own accord, indicating that he knew he was within his right to do so. Regardless of the condition of Defendant at the time he was awoken by the officers, he no longer showed any sign of intoxication when he later waived his rights and spoke with Hill. Thus, the Court concludes

7

that Defendant had the capacity to, and did, knowingly and intelligently waive his rights before engaging in the interview.  See United States v. Walters, No. CR. 01-37-PH, 2001 WL 1028370, at *4-5 (D. Me. Sept. 7, 2001) (rec. dec., aff'd Sept. 28, 2001) (finding the defendant's waiver knowing and intelligent even where there was evidence that he was still intoxicated at the time of the waiver).  Accordingly, the Court declines to suppress any of the statements Defendant made during his interview with Hill.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 28) is GRANTED IN PART AND DENIED IN PART.


SO ORDERED.

    /s/ George Z. Singal
    United States District Judge

Dated this 26th day of October, 2018.